RECEIVED
IN MONROE, LA

JUN 1 8 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **LYNETTE TAYLOR DHILLON** | **CIV. ACTION NO. 06-1822** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **LINCARE INC. OF DELAWARE** | **MAG.  JUDGE KAREN L. HAYES** |

**RULING**

Plaintiff Lynette Taylor Dhillon ("Dhillon") brought this lawsuit against her former

employer Lincare Inc. of Delaware ("Lincare"), alleging racial and sexual harassment and racial

discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e, *et seq.*, and assault and battery and intentional infliction of emotional distress in violation

of state law.

Before the Court are two related motions filed by Lincare: a Motion to Strike [Doc. No.

46] and a Motion for Summary Judgment [Doc. No. 35].  Dhillon has filed memoranda in

opposition to Lincare's motions [Doc. Nos. 42 & 61], and Lincare has filed reply memoranda in

support of the motions [Doc. Nos. 49 & 70].

For the following reasons, Lincare's Motion to Strike and Motion for Summary Judgment

are GRANTED IN PART and DENIED IN PART.

## I.    FACTS AND PROCEDURAL HISTORY

On January 5, 2004, Dhillon married Shamsher Singh Dhillon, a native of India.

Shortly after her marriage, in March 2004, Dhillon, who is a licensed practical nurse, was

hired by Lincare as a Healthcare Specialist in its Monroe office.  Lincare is a provider of oxygen,

respiratory and home infusion products and services.

On the effective date of her hiring, March 29, 2004, Dhillon received a copy of Lincare's employee handbook, containing the company's Anti-Harassment Policy, Problem Resolution Procedure, and Reporting of Irregularities Procedure. Dhillon watched a video tape on harassment in the workplace.

Lincare's Anti-Harassment Policy prohibits harassment based on race, sex, and other legally protected status "whether committed by supervisory or non-supervisory personnel." Employees in the Monroe or Ruston office who believe they are being harassed are instructed to notify the Region Manager, the Employee Relations Director or the Human Resources Manager.[1] Dhillon was familiar with the procedures for reporting harassment prior to her resignation.

Lincare's Problem Resolution Procedure is a four-step process to allow employees to raise grievances. An employee initiates the process by raising the grievance with his or her immediate supervisor. If the employee is dissatisfied with that supervisor's response, then he or she continues to have the grievance reviewed by other managers at steps two and three. At the fourth step, the employee can submit a written complaint to the Employee Relations Director.

Lincare's employee handbook also provides a 1-800 telephone number for employees to report "any known or suspected irregularities, conflict of interest or issues of business integrity or ethics."

In the Monroe office, Dhillon worked under the supervision of Shawnda Bairnsfather ("Bairnsfather"). During this time, Dhillon testified that she suffered "occasional harassment" by T.J. Wright ("Wright") and Jamie Jones ("Jones"), her co-workers. She did not report this

---

[1]The reporting procedures identify persons by title only, not name.

2

harassment to Bairnsfather.

In October 2004, Dhillon transferred to the Ruston office. According to Dhillon, she transferred offices to avoid the harassment. Her supervisor in Ruston was Cathy Roan ("Roan").

Between February and March, 2005, Wright made some of the same type of comments to Dhillon in the Ruston office.[2]

In March 2005, Roan became the manager of the Monroe office. Dhillon accepted a raise of $2.50 per hour to return to the Monroe office.

In May 2005, Wright became Operations Manager in the Monroe office, but did not supervise Dhillon. In that month, Dhillon alleges that she went to Roan and complained that "they were making a lot of racial remarks that I didn't appreciate."

Between June and October 2005, Dhillon testifies that there were 25-30 instances when co-workers used the terms "sand nigger," "towel head," "rag head," and "camel jockey."

In July 2005, Dhillon's co-workers, Nicole Platt ("Platt") and Melissa Hammett ("Hammett"), said that foreigners stink and are nasty and asked "how anyone could be married to them?". Although Platt and Hammett did not say this directly to Dhillon, they allegedly said it outside her office and loudly enough for her to hear. Dhillon further alleges that these statements were made in the hearing of Roan.

In August 2005, Wright changed the password on Dhillon's computer to "camel jockey" and then called Dhillon on her cell phone to tell her. When Dhillon returned to the office, she changed the password to "TJ Sucks." Roan was on vacation at the time the password was changed,

---

[2]It is unclear to the Court what Wright's job status was at this time. In his deposition, he testified that he transferred from the Jackson, Mississippi office to the Monroe office in May 2005. Regardless, the Court accepts as true that Dhillon interacted with Wright in the Ruston office for this two-month period.

3

but when she returned she met with Wright and Jones, who was also involved, and told them that the use of this term was not appropriate.

Dhillon tried to end the alleged harassment by explaining that her husband is Sikh, not Muslim, and from India, not the Middle East. Wright and Jones responded that "they [are] all the same." In September 2005, Dhillon alleges that she even told co-workers that she was divorcing or had divorced her husband to stop the comments, but they continued to make the same type of comments to her.

A week or two before October 13, 2005, Wright allegedly kicked Dhillon in the butt and told her to "get her ass to work."[3]

During her employment, Dhillon also alleged that Hammett and other co-workers commented that she "smelled like shit" or that she stank. On one occasion, Dhillon also alleges that Roan asked her "what stinks?".[4] Some time in October 2005, Dhillon mentioned these comments to Roan.[5]

On October 13, 2005, Roan held a meeting with Dhillon, Hammett, and Platt regarding their dispute over an assignment. Platt and Hammett are customer service representatives. Platt had called Dhillon and told her to go to a child's home to perform an assessment. Dhillon's assessment was to be provided to a physician as part of an investigation into whether the child's

---

[3]In its statements, counsel sometimes referred to Wright's statement as being for Dhillon to "move her fat ass," Dhillon testified that Wright said for her to "get her ass to work."

[4]Lincare contends that Roan's question referred to a sewage problem at the Monroe office. Dhillon acknowledged that the sewage problem did sometimes cause an unpleasant smell in the Monroe office.

[5]Roan denies that any incidents, other than the password change, were ever reported to her. However, for purposes of summary judgment, the Court accepts Dhillon's testimony as true on this issue.

4

mother had been neglectful. Although Dhillon did not want to go, she performed the assessment. At the meeting with Roan, Platt and Hammett complained that Dhillon did not want to do the assessment, and Dhillon responded that she felt uncomfortable doing so when she had not set up the equipment. Roan told the three employees that they needed to work out their own conflicts. Dhillon's complaints of harassment were not raised or discussed at the meeting.

After this meeting, Dhillon went to the back of the office and again heard Wright and Jones[6] using the term "raghead."

On the morning of October 17, 2005, Dhillon called Roan and told her that she would be late because she had to take her daughter to the doctor. Roan replied that she was "sick of [Dhillon's] shit" and hung up. Dhillon had not decided to quit work at Lincare until Roan hung up on her. Dhillon then called Roan back and said, "I quit." On the same day, Dhillon typed a letter of resignation to Buddy Felter ("Felter"), Area Manager, and Carlos Somoza ("Somoza")[7], Region Manager, and to the Human Resources Department, which set forth her complaints of harassment. She hand-delivered the letter to the area corporate office.

On October 24, 2005, Dhillon submitted a completed form to the EEOC, detailing the alleged harassment that she suffered because of her husband's race.

On November 6, 2005, Dhillon filed a Charge of Discrimination. Only the box for race was checked.

On August 22, 2006, Dhillon's attorney, Marcy Allen, submitted a letter to the EEOC again

---

[6]In his deposition, Jones testified that he and Dhillon had a running joke about her being married to a "brown man" and that Dhillon never asked him to stop joking, laughed, and joked back with him.

[7]Somoza's name is spelled differently in other documents, but Lincare has indicated that this is the correct spelling of his name.

detailing her complaints, but adding that she had been discriminated against based on five discrete actions: (1) failure to notify of promotion opportunities, (2) denial of a promised pay raise in April 2005, (3) poor assignments and assignment of deliveries that could have been handled by drivers, (4) award of lower percentage bonus than comparable employees, and (5) working of overtime hours to avoid harassment. The letter was received by the EEOC on August 24, 2006. Although the record does not indicate when Dhillon requested her Notice of Right to Sue, the Notice issued only seven (7) days later on August 31, 2006.

Dhillon timely filed this lawsuit on October 16, 2006.

## II.     LAW AND ANALYSIS

### A.     Motion to Strike

In its Motion to Strike, Lincare argues that the Court should strike the affidavits of current/former Lincare employees, Terri Douglas ("Douglas"), Chris Dowdy ("Dowdy"), and Lewis Thompson ("Thompson") and should strike Dhillon's Statement of Contested Material Facts. Lincare contends that the affidavits fail to comply with Federal Rule of Civil Procedure 56(e) because they contain opinion, not facts. Lincare further contends that the Statement of Contested Material Facts contains statements that "draw legal conclusions" and statements that are "unsupported" and "argumentative." Lincare moves the Court to strike Statement of Contested Material Facts numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 18, 24, 25, and 26.

First, the Court will GRANT IN PART the Motion to Strike the affidavits. The parties cite competing rules of law to support their respective positions. According to Lincare, affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). Because the witnesses' statements are conclusory, they cannot be used to defeat summary judgment. *See*

6

*Ramon v. Continental Airlines, Inc.*, 153 Fed. Appx. 257 (5th Cir. 2005). This is a correct statement of the law.

Dhillon responds that, under Federal Rule of Evidence 701, a lay witness may express an opinion if it is "rationally based on the perception of the witness and . . . helpful to . . . the determination of a fact in issue." In limited circumstances, courts may allow lay witnesses to express their opinions about the motivation of another person if the witness has an adequate opportunity to observe the underlying circumstances. *Hansard v. Pepsi-Cola Metropolitan Bottling Co., Inc.*, 865 F.2d 1461, 1466 (5th Cir.1989). This is also a correct statement of the law.

In this case, portions of the witnesses' affidavits are admissible, and portions are not. With regard to all three affidavits, the Court will strike and disregard the final conclusory statements that the work environment was "hostile" to Dhillon as that is a legal conclusion to be resolved by the Court on summary judgment and, ultimately, by the jury if there is genuine issue of disputed fact. The Court will also strike the conclusory statements in each affidavit that Wright and Jones made "offensive remarks" to Dhillon "because she was married to someone from the Middle East." Although in Douglas's and Dowdy's affidavits, they have identified remarks they personally heard Wright and Jones make, none of the affiants identify what "offensive remarks" were made to Dhillon and give the Court no information as how it could be determined that the remarks were made to her because of her inter-racial marriage.

The more difficult question for the Court is the statement contained in each affidavit that many of Wright's and Jones's "racially offensive remarks were made in front of the office manager, Cathy Roan." After careful review, the Court will consider this statement in the affidavits of Douglas and Dowdy, but will strike the statement in the affidavit of Thompson. The Court finds that, in the case of Douglas and Dowdy, they have identified specific statements which they allege

7

were made in the office and that these type of statements were made in front of Roan. However, Lewis had not alleged any specific statements, and his affidavit is completely conclusory. The Court will consider the remainder of the statements contained in each of the affidavits.

Second, the Court will GRANT IN PART Lincare's Motion to Strike the Statement of Contested Material Facts. Lincare argued in its motion that the "most glaring objection" was to Dhillon's "attempt to pass off the legal conclusions and opinions of . . . counsel as 'contested facts.'" She identifies such attempts in Statements 1-12 and 24. Lincare also objects to Statement 18 as containing a legal conclusion and because it is based on the affidavits which Lincare contends should be stricken. In Statement 25, Lincare objects to Dhillon's characterization of her decision not to report to Somoza as "reasonable." Finally, Lincare objects to Dhillon's Statement 26 that the "discrimination and harassment" she experienced "created a hostile work environment." Lincare again points out that this is an improper legal conclusion and that it is based on the statements in the affidavits which Lincare also contends are improper.

In response, Dhillon contends that her Statement "should be assessed in conjunction with the documentary evidence on which such statements rest," and the Court should disregard "[o]nly those portions" it "deems inadequate." Alternatively, Dhillon submitted a revised Statement of Contested Material Facts.

Lincare then obtained leave of Court to file a reply. Lincare takes issue with Dhillon's submission of a revised Statement of Contested Material Facts when its Motion to Strike was pending. Lincare also objects to the revised Statement of Contested Material Facts.

Having reviewed the Revised Statement of Contested Material Facts, the Court finds nothing improper about Dhillon's submissions while the Motion to Strike was pending. Dhillon, in essence, conceded that portions of its facts contained legal conclusions and provided the Court with

8

a redacted version of its prior statement of facts. Based on those revisions, the Court determines

Dhillon's revised Statement of Contested Material Facts numbers 1-3, 5-13, 18, 24, 25, and 26 are

proper and will be considered by the Court. Lincare's Motion to Strike these statements is

DENIED.

However, the Court agrees with Lincare that Dhillon's revised Statement of Contested

Material Facts number 4 calls for a legal conclusion and, therefore, is not proper. Lincare's Motion

to Strike this statement is GRANTED.[8]

The Court notes that Lincare identified additional objections to Dhillon's revised Statement

of Contested Material Facts not originally discussed in its Motion to Strike. The Court will

consider those arguments when reviewing the alleged facts in the context of the entire record, but

will not strike the facts altogether. Thus, these additional objections are DENIED.

## B.    Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to

interrogatories and admissions on file, together with any affidavits, show that there are no genuine

issues as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis

for its motion by identifying portions of the record which highlight the absence of genuine issues of

material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if

proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law

in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material

---

[8]For the same reason, the Court will not consider Dhillon's statement number 36. The Court
has not "stricken" this "fact" because Lincare offered no argument on it. However, as it would have
done even without a Motion to Strike, the Court disregards any legal conclusion contained in the
revised Statement of Contested Material Facts.

fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B.      Title VII**

Title VII forbids employers to take actions on the basis of race or sex that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Sexual and racial harassment are both forms of discrimination prohibited under Title VII. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986); *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393 (5th Cir. 2007).

Lincare contends that it is entitled to summary judgment on Dhillon's claims of sexual and racial harassment and racial discrimination on four bases: (1) Dhillon has failed to exhaust her administrative remedies as to her claims of sexual harassment and discrete acts of racial disrimination; (2) Dhillon has not alleged any actions sufficiently severe or pervasive to subject Lincare to liability for a hostile work environment; (3) Dhillon unreasonably failed to take advantage of Lincare's procedures for reporting sexual harassment; and (4) Dhillon's

10

constructive discharge claim is without merit.

### 1.    Scope of the EEOC Charge

First, Lincare contends that it is entitled to summary judgment because Dhillon failed to

exhaust her administrative remedies prior to asserting a claim of sexual harassment and a claim

of race discrimination based on failure to promote, compensation, and job assignment.  Lincare

contends that these claims exceed the scope of Dhillon's EEOC charge.

A plaintiff in an employment discrimination case must timely exhaust all statutorily

required administrative remedies before filing suit.  *Young v. City of Houston, Texas*, 906 F.2d

177, 179 (5th Cir. 1990).  "The scope of inquiry of a court hearing in a Title VII action 'is

limited to the scope of the EEOC investigation which can reasonably be expected to grow out of

a charge of discrimination.'" *Id.* (quoting *Sanchez v. Standard Brands*, 431 F.2d 455, 466 (5th

Cir. 1970)).  As the Fifth Circuit has explained, the logic behind this rule is based on statutory

intent:

> A charge of discrimination is not filed as a preliminary to a lawsuit.  On the
> contrary, the purpose of a charge of discrimination is to trigger the investigatory
> and conciliatory procedures of the EEOC.  Once a charge has been filed, the
> Commission carries out its investigatory function and attempts to obtain voluntary
> compliance with the law.  Only if the EEOC fails to achieve voluntary compliance
> will the matter ever become the subject of court action.  Thus it is obvious that the
> civil action is much more intimately related to the EEOC investigation than to the
> words of the charge which originally triggered the investigation.  Within this
> statutory scheme, it is only logical to limit the permissible scope of the civil
> action to the scope of the EEOC investigation which can reasonably be expected
> to grow out of the charge of discrimination.

431 F.2d at 466; *see also Benson v. Mary Kay, Inc.*, No. 3:06-CV-1911-R, 2007 WL 1719927(N.

D. Tex. June 11, 2007) ("This requirement serves the dual purposes of giving the employer some

warning as to the conduct about which the employee is complaining and affording the EEOC and

11

the employer an opportunity to settle the dispute through conciliation.") (citing *Sanchez*, 431

F.2d at 466).

In this case, Dhillon filed an EEOC charge in which she alleged racial harassment and

constructive discharge on the following bases:

I. Since on or about July 2005, I had been subjected to harassment and racial slurs, and forced to resign on October 17, 2005. Respondent provides respiratory care, infusion therapy and medical equipment to patients in the home, employs more than 500 employees.

II. July 2005 was told that foreigners stink and are nasty by Nicole Platt and Melissa Hammett. The Center Manager, Cathy Roan was present. It was said loud enough for me to hear in the next room "How can anyone be married to them" [sic] Jamie Jones said they smelled like "shit." On Multiple [sic] instances the same remark that I smell like shit or comments that I smell or wasn't clean were made. The comments were made by T.J. Wright, Operations Manager, Jamie Jones, Driver, Melissa Hammett, Nicole Platt and even the manager Cathy Roan. The last week of August my password was changed to "Cameljockey" on the computer by TJ [sic] then he called me on my cell phone to tell me about it. October 13, 2005 and 20 to 30 times throughout my employment, offensive remarks were made such as "sandnigger, towelhead, cameljockey". I tried to explain that my husband was from India not Saudi Arabia and that he was Sikh not Muslim. I was told "They are all the same" by TJ and Jamie. I even told them that I divorced him in September in hopes it would stop but it didn't. When I complained to the manager Cathy Roan it was just discussed as office gossip and the frequency increased. In a meeting on October 13, 2005, Mrs [sic] Roan said that employee differences would have to be worked out between ourselves. I knew this problem wouldn't end so I resigned.

III. I believe that I have been discriminated due to my association with my husband who is from India, in violation of Title VII of the Civil Rights Act of 1964 as amended.

[Charge of Discrimination, attached as Exhibit to Complaint, Doc. No. 1]. Dhillon does not

allege in the Charge that she was subjected to sexual harassment or subjected to racially

disparate treatment in terms of the denial of promotions, discriminatory compensation, or

discriminatory job assignments. Nevertheless, Dhillon argues that "these issues were clearly raised," relying on three affidavits and an August 22, 2006 letter from her counsel to the EEOC.

First, with regard to Dhillon's allegations of sexual harassment, the Court finds that she failed to exhaust her administrative remedies. Even if the Court could rely on counsel's August 22, 2006 letter and the May 2006 affidavits submitted to the EEOC, these documents do not suggest or refer to sexual harassment. Further, the Court would not reasonably expect that the scope of the EEOC's investigation into Dhillon's claims of harassment based on her marriage to a man from India to grow into an investigation for sexual harassment. Dhillon's claims of sexual harassment are DISMISSED for failure to exhaust administrative remedies.[9]

Second, the Court addresses Dhillon's race discrimination claim that she was discriminatorily denied promotion opportunities, given poor job assignments, and provided lesser compensation.[10] The Court concludes that Dhillon's race discrimination claim also exceeds the scope of her EEOC Charge. Although an EEOC charge should be construed liberally[11] to encompass "any kind of discrimination like or related to the charge's allegations,"

---

[9]The Court need not reach the merits of Dhillon's sexual harassment claims. Substantively, however, the type of actions alleged do not appear to be based on sex and do not rise to the level of severe or pervasive harassment based on the jurisprudence of the Fifth Circuit. The Court certainly agrees with counsel for Dhillon that the actions alleged, if true, "tend to establish that an appropriate amount of supervision in the workplace was lacking," but lack of civility does not amount to severe or pervasive sexual harassment.

[10]Although Dhillon uses the terms sexual and racial harassment, she refers to these employment actions as "discrimination." [Doc. No. 1, ¶ 11].

[11]Notably, "the scope of an EEOC charge should be liberally construed for litigation purposes because Title VII 'was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship.'" *McClain v. Lufkin Industries, Inc.*, 519 F.3d 264, 273 (5th Cir. Feb. 29, 2008) (quoting *Sanchez*, 431 F.2d at 465). Dhillon did not file her charge, pro se, however. She was represented by attorney Reva Lupin and later by Marcy Allen and Mike

*Fellows v. Universal Rests., Inc.*, 701 F.2d 447, 451 (5th Cir. 1983), Dhillon's disparate treatment claim is not sufficiently like or related to her allegations of racially hostile work environment and constructive discharge, so that an investigation into this claim would reasonably have been expected to grow out of the Charge. *See Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1279-80, 1279 n.4 (5th Cir. 1994) (While a claimant may rely on a single set of facts to support claims of both harassment and discrimination, the two causes of action are distinct, and she must show that she exhausted her administrative remedies as to both claims).

In *Clark v. Kraft Foods, Inc.*, 18 F.3d 1278 (5th Cir. 1994), the Fifth Circuit determined that an employee had exhausted her claim of disparate treatment based on gender, even though the charge of discrimination referred only to sexual harassment. In that case, the claimant, who was pro se, alleged that "'1. I was harassed because of my sex, female. 2. I was sexually harassed.'" *Id.* at 1280. The charge itself never used the terms "gender discrimination," "sex discrimination," or "disparate treatment." However, the Fifth Circuit looked to Clark's affidavit and discharge questionnaire, both of which identified gender disparities in job assignment and pay. In addition, the Fifth Circuit found that Kraft, the employer, understood Clark to have alleged gender discrimination because it had "denied the existence of any 'evidence that female employees are more frequently terminated or otherwise more harshly treated in the disciplinary process.'" *Id.* Although the Fifth Circuit was "mindful that the actual scope of an EEOC investigation does not determine whether a claim is exhausted,"[12] the Court was also "mindful that investigation of a particular claim creates a strong inference that such a claim was

---

Rhymes. See [Doc. No. 35, Exh. 23].

[12] *Cf. McLain*, 519 F.3d at 274 (The "actual scope of the EEOC's investigation . . . is clearly pertinent to an exhaustion inquiry.") (citations omitted).

14

presented." *Id.* Based on the particular facts of this case, the Fifth Circuit concluded that "sexual harassment and retaliation . . . were Clark's principal allegations at the administrative stage," but that it is "also apparent in the statements of Clark, Kraft, and the EEOC that Clark raised a gender-based disparate treatment claim sufficient to prompt an EEOC investigation." *Id.* at 1281.

In support of her hostile work environment and constructive discharge claims, Dhillon alleged conduct that could only be characterized as harassment. It is not reasonable to expect that the EEOC investigation into the type of constant verbal harassment she predominantly alleged would uncover discrete acts of discrimination which she had not alleged. Further, unlike in *Clark*, there is no evidence outside the facts contained in the Charge to support a conclusion in favor of exhaustion. Instead, the evidence suggests that shortly before Dhillon requested her Notice of Right to Sue, her attorney attempted to present an untimely amendment to her Charge to include a claim of race discrimination.[13] There is no evidence that the EEOC previously understood Dhillon to be pursuing a race discrimination claim, that the EEOC requested any information from Lincare on these claims, or that the EEOC notified Lincare of any such claims against it. *See* 42 U.S.C. § 2000e-5 (b) (requiring the EEOC to serve upon the employer notice of the charge and the underlying facts within ten days of its filing). Finally, there is no evidence from Lincare's response to the EEOC Charge that it understood Dhillon to be alleging discrimination and disparate treatment.

Therefore, the Court finds that Lincare is entitled to dismissal of Dhillon's claims of

---

[13]Dhillon had 300 days from the date these alleged actions took place to file a charge with the EEOC. Even if these claims had been timely when her Charge was originally filed, there is no "relation back" under Title VII that permits parties to later amend the Charge to add claims.

15

sexual harassment and race discrimination in promotions, compensation, and job assignments.

Lincare's Motion for Summary Judgment on these claims is GRANTED.

### 2. Racially Hostile Work Environment

Lincare contends that Dhillon has failed to establish that she was subjected to severe or

pervasive harassment sufficient to create a hostile work environment.

Dhillon alleges that she was subjected to harassment based on the race of her husband

(Indian).[14]  To prevail on her claim alleging hostile work environment based on the race of her

husband, Dhillon must prove: (1) she belongs to a protected class; (2) she was subjected to

unwelcome harassment; (3) the harassment complained of was based on her husband's race or

her interracial relationship[15]; (4) the harassment complained of affected a term, condition, or

privilege of employment; and (5) the employer knew or should have known of the harassment in

question and failed to take prompt remedial action.  *See Frank v. Xerox Corp.*, 347 F.3d 130, 138

(5th Cir. 2003); *see also Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 156 F.3d 581, 589 (5th

Cir.1998), *modified en banc on other grounds*, 182 F.3d 333 (5th Cir. 1999).[16]

---

[14]Dhillon characterizes her claim as based on "race," although her husband's nationality or ethnicity is Indian.  Nevertheless, whether characterized as race or national origin, Dhillon's claims are subject to consideration under Title VII.

[15]The Fifth Circuit has not identified a clear test in this area, but whether Dhillon must show that the harassment was based on her husband's race itself or the fact that she had an interracial marriage does not affect the Court's analysis.

[16]When the harassment is committed by a supervisor with immediate or successively higher authority over the harassment victim, the employee need only prove the first four elements.  *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001).  In this case, there is evidence that Wright worked for at least part of the time in a supervisory capacity for Lincare, but there is no evidence that he was ever **Dhillon's** supervisor.  Therefore, she must prove all five elements with regard to the allegations against him and her other co-workers.  She need not prove the fifth element as to the comments made by Roan.

16

An employer may raise an affirmative defense by showing that it exercised reasonable care to prevent and promptly correct the harassing behavior and that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998).

In determining whether a workplace constitutes a hostile work environment, courts should look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Green v. Adm'rs. of the Tulane Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002). A recurring point in the Supreme Court's hostile environment cases is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher*, 524 U.S. at 788. The standards set forth by the Supreme Court seek to ensure that Title VII does not become a "general civility code." *Oncale v. Sundowner Offshore Svcs. Inc.*, 523 U.S. 75, 80 (1998). Properly applied, these standards will filter out complaints attacking "the ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 172 (1992)). The Supreme Court has made it clear that conduct must be so extreme, so severe or pervasive, as to amount to a change in the terms and conditions of employment. *Id.*

Lincare does not contest that Dhillon is a member of a protected class based on her marriage to a native of India or, for purposes of summary judgment, that she was subjected to unwelcome harassment based on her husband's race. Instead, Lincare contends that Dhillon cannot meet her required showing that the harassment affected a term or condition of her

17

employment in that it was not severe or pervasive.

While Dhillon's allegations do not rise to the level of severe harassment under Fifth
Circuit precedent, she need only raise a genuine issue of material fact for trial whether
harassment was severe **or** pervasive, not both. *See Harvill v. Westward Commc'ns L.L.C.*, 433
F.3d 428, 434 (5th Cir. 2005)("In requiring [the plaintiff] to establish that the conduct was both
severe and pervasive, the district court applied the wrong legal standard. . . . [T]he Supreme
Court has stated that Title VII provides a legal remedy to victims who establish that the abusive
conduct was severe or pervasive."). "Frequent incidents of harassment, though not severe, can
reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment
such that a hostile work environment exists." *Lauderdale v. Texas Dept. of Criminal Justice,
Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). Dhillon alleges that she was subjected to
an almost daily stream of racial epithets during most of her employment of 1 ½ years. She
testified that she transferred to the Ruston office to avoid the occasional harassment from Wright
and Jones during her initial employment. She further testified that she only returned to the
Monroe office when she was given a $2.50 an hour pay increase. After her return to Monroe,
during the four-month period between June and October 2005, Dhillon alleges 25-30 specific
instances when she was subjected to racial epithets, such as rag head, camel jockey, towel head,
and sand nigger, and other related comments about Middle Easterners.[17] While the statements
and actions of her co-workers may not be as severe as other cases that have survived summary
judgment, Dhillon has raised a genuine issue of material fact whether the harassment was so

---

[17]As noted, Dhillon's husband is from India, a country in southern Asia, but Dhilllon's
attempts to point this out to her co-workers were allegedly also met with derision.

18

pervasive as to create an abusive work environment given the number and type of comments,

accompanied by at least one physical threat from Jones, during a relatively short time period.

*See id.* at 164 (The "frequency of unwanted attention, [plaintiff endured] over a four-month time

period, amounts to pervasive harassment. Given this pervasiveness, the level of severity

necessary to establish an altered work environment is diminished . . .").

### 3.   The *Faragher/Ellerth* Defense

Lincare argues that it is entitled to application of the *Faragher/Ellerth* defense to

Dhillon's hostile work environment claims because she unreasonably failed to take advantage of

Lincare's reporting procedures.  Dhillon responds that  Lincare's anti-harassment policy was

ineffective and unreasonable and that her reporting attempts were stifled.

When an employee alleges harassment by a supervisor, he or she is not required to show

that the employer knew or should have known about the harassment.[18]  Knowledge is presumed

because of the harasser's supervisory status.  If the supervisor uses his position to take a tangible

employment action against the employee, then the employer is liable for actionable hostile work

environment.  If there is no tangible employment action, however, *Faragher/Ellerth* permits "a

defending employer [to] raise an affirmative defense to liability or damages, subject to proof by

_____

[18]This is not a straightforward case of supervisor harassment to which the
*Faragher/Ellerth* defense typically applies.  Dhillon's claims of harassment are largely leveled
against her former co-workers, Wright, Jones, Platt, and Hammett.  Jones, however, was a
supervisory-level employee during the period of May 2005 to her resignation in October 2005.
Dhillon also contends that her former supervisor, Roan, was present for some of the harassment
and either "giggled," ignored the comments, or, on one occasion, actually participated by asking
Dhillon "what stinks?".  The parties seem to agree that the *Faragher/Ellerth* defense is at issue;
thus, the Court can only conclude that, at least for purposes of summary judgment, Lincare
concedes that Dhillon has raised a genuine issue of material fact whether it knew or should have
known of the co-worker harassment.

19

preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c)." *Faragher,* 524 U.S. at 807. In this case (other than her constructive discharge, which will be addressed separately), Dhillon has not properly raised any claims of tangible employment action.[19] Thus, Lincare can raise this defense.

The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

In general, the case law suggests that an employer may satisfy the first prong by demonstrating that it had an anti-harassment policy which it promulgated to employees and properly implemented and that, if an employee makes a complaint under that policy, the employer conducts a prompt investigation. *See Williams v. Admin. Review Bd.*, 376 F.3d 471, 478-79 (5th Cir. 2004); *Wyatt v. Hunt Plywood Co, Inc.*, 297 F.3d 405, 410, 413 (5th Cir. 2002). Any remedial steps taken by the employer "must be 'reasonably calculated' to end the harassment." *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir.1999)(quoting *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir.1986)). "What constitutes prompt remedial action depends on the facts of the case, and 'not every response by an employer will be sufficient to discharge its legal duty.'" *Id.* at 615 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989)).

As to the second prong, *Faragher* instructs that "[i]f the victim could have avoided harm,

---

[19]Of course, Dhillon alleged failure to promote, discriminatory compensation, and discriminatory job assignments, but the Court has already determined that those claims were not within the scope of the EEOC charge and thus are not actionable.

no liability should be found against the employer who had taken reasonable care, and if the
damages could reasonably have been mitigated, no award against a liable employer should
reward a plaintiff for what her own efforts could have avoided." 524 U.S. at 807.

It is undisputed in this case that Lincare's employment handbook contained an Anti-
Harassment Policy with reporting procedures and that it also contained a Problem Resolution
Procedure and a Reporting of Irregularities Procedure. It is also undisputed that Dhillon was aware
of these policies, but did not report the alleged harassment to any of the individuals identified by
title in the Anti-Harassment Policy until she submitted her letter of resignation.

Under the Anti-Harassment Policy, Dhillon was to report to the Region Manager, Somoza;
the Employee Relations Director; or the Human Resource Manager. Under the Problem Resolution
Procedure, Dhillon was to go first to her supervisor, Roan; then to the Area Manager, Felter; then
to any Region Manager, Somoza (her Region Manager); and finally to the Employee Relations
Director.

Dhillon testified that she went to her direct supervisor, Roan, on three or four occasions to
complain of the harassment. If the jury were to believe Dhillon's version of events,[20] Roan
generally ignored the behavior, "giggled" at the comments, and, at the October 13, 2005 meeting
told Dhillon and her co-workers that they needed to work conflicts out among themselves.[21]

---

[20]Roan denies that she heard any racial remarks made at Lincare and further denies that
Dhillon reported any harassment to her other than the password incident. For purposes of summary
judgment, however, the Court must view the evidence in the light most favorable to the plaintiff.

[21]Although the October 13, 2005 meeting was to discuss an incident apparently unrelated
to the harassment, Dhillon has testified that the two employees involved, Hammett and Platt,
previously made racially offensive remarks to her within the hearing of Roan. Under these
circumstances, Dhillon interpreted Roan's remarks to mean that she expected employees to work
out **any** problems among themselves.

Roan's own testimony was that she told Wright and Jones that use of the term "camel jockey is inappropriate . . . that people take offense at it." [Roan Dep., p. 60].

Dhillon further testified as to an incident involving Felter, the Area Manager. Felter told Dhillon that he heard she was having problems with Wright, commented "what else is new?" and closed her door before she could expound on the problems. Because of this incident, Dhillon "assumed" Felter knew of Wright's harassment.

Dhillon also called the corporate office and was told to report any grievances in accordance with the chain of command (beginning with her supervisor).

Finally, one of the persons identified by title in the Anti-Harassment Policy and the Problem Resolution Procedure was Somoza, the Region Manager. However, Somoza is the father-in-law of the main harasser, Wright. Dhillon testified that she feared retaliation if she reported the harassment by Wright and his "friends" to Somoza.

The Court cannot conclude as a matter of law that Dhillon, if believed, was unreasonable for failing to go through the "chain of command" for reporting the harassment. While there were other methods of reporting the harassment to Lincare, such as reporting to the Human Resources Department or Employee Relations Director, Dhillon testified that she did not have the telephone number. Lincare's counsel suggested that she could have hand-delivered the complaint as she did her resignation, but Dhillon's letter of resignation was hand-delivered to Somoza's office, which, again, brings up the issue of his relationship with Wright.

Finally, Lincare suggests that Dhillon could have reported the issues regarding Wright's relationship with Somoza by contacting the Employee Relations Director under the Reporting Irregularities Procedure. However, as Dhillon points out, the policy in this area did not clearly apply to the situation.

Having reviewed the policies contained in the handbook, given the responses Dhillon had

allegedly received from Roan, the statements made to her by Felter, and Somoza's family

relationship with Wright, the Court cannot conclude, as a matter of law that Lincare exercised

reasonable care to prevent and correct promptly any harassment and that Dhillon **unreasonably**

failed to take advantage of any preventative or corrective opportunities.

Accordingly, Lincare's Motion for Summary Judgment is DENIED as to its

*Ellerth/Faragher* defense. Lincare may present this defense at trial.

### 4. Constructive Discharge

Lincare also moves for summary judgment on Dhillon's claim of constructive discharge.

According to Lincare, Dhillon cannot meet her burden because she resigned without attempting

to follow any of the several methods of reporting the harassment to Lincare and/or without filing

any EEOC charge. Dhillon responds that she was continuously subjected to severe and

pervasive harassment and that her attempts to report that harassment had been ignored by her

immediate supervisor, Roan, and by upper management, Felter.

Although Dhillon has presented a genuine issue of material fact whether she was

subjected to harassment so pervasive as to alter her conditions of employment, "to establish

'constructive discharge,'[she] must make a further showing." *Pennsylvania State Police v.*

*Suders*, 542 U.S. 129, 133 (2004) (citations omitted). "She must show that the abusive working

environment became so intolerable that her resignation qualified as a fitting response." *Id.* In

other words, the plaintiff "must establish that working conditions . . . were so intolerable that a

reasonable employee in her position would feel compelled to resign." *Webb v. Cardiothoracic*

*Surgery*, 139 F.3d 532, 539 (5th Cir.1998) (citing *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315,

319 (5th Cir. 1997), *overruled on other grounds* by *Burlington Northern and Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53 (2006); *Suders,* 542 U.S. at 141; *Brown v. Kinney Shoe Co.,* 237 F.3d 556,

566 (5th Cir.2001) ("Constructive discharge requires a greater degree of harassment than that

required by a hostile environment claim."). Further, "unless conditions are beyond 'ordinary'

discrimination, a complaining employee is expected to remain on the job while seeking redress."

*Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) *cited in Suders*, 542 U.S. at

147.

The Fifth Circuit has considered several factors relevant to a determination that an

employee reasonably could have felt her working conditions were sufficiently intolerable:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4)
> reassignment to menial or degrading work; (5) reassignment to work under a
> younger supervisor; (6) badgering, harassment, or humiliation by the employer
> calculated to encourage the employee's resignation; or (7) offers of early
> retirement or continued employment on terms less favorable than the employee's
> former status.

*Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000); *see also Hooker v. Victoria's Secret*

*Stores, Inc.*, 2001 WL 1692436 , *3, 281 F.3d 1278  (5th Cir. 2001) (same).  The Fifth Circuit

has further held that a determination of intolerability "depends on the facts of each case," and

that the factors are considered " 'singly or in combination,'" indicating that no one factor

predominates. *Brown*, 207 F.3d at 782.

Dhillon's allegations, if true, suggest a workplace that was pervasive with the use of

racial epithets and the kind of improper "joking," in the words of one alleged harasser, that can

constitute racial harassment.  However, she has not met the higher burden necessary for

constructive discharge.  Dhillon has presented no evidence of demotion, reduction in salary or

responsibilities, reassignment, or other detrimental or degrading changes to the terms of her

24

employment. To the contrary, she received a raise in pay and agreed to return to the Monroe office (where she had previously suffered harassment).[22] In fact, Dhillon admits that she had not decided to resign after the months of alleged harassment until her October 17, 2005 telephone call with Roan. It was that call and Roan's comment that she was "tired of [Dhillon's] shit" that resulted in Dhillon's resignation.

While the Court has concluded that Dhillon raised a genuine issue of material fact on her harassment claim, the Court cannot also conclude that Dhillon's evidence is sufficient to find a genuine issue of material fact whether her work situation was so intolerable that she was compelled to resign rather than take other actions.[23] Accordingly, Lincare's Motion for Summary Judgment on this claim is GRANTED.

### 5.    Punitive Damages

Lincare also moves for summary judgment on Dhillon's claim for punitive damages.

A plaintiff who prevails on her Title VII claim may recover punitive damages if she makes the required showing. Under the Supreme Court's decision in *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999), the Fifth Circuit has set forth the standard to be applied when an employer is alleged to be liable for punitive damages based on the actions of a managerial employee:

> A plaintiff may recover punitive damages if the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The availability of punitive damages turns

---

[22]She does allege that she was required to perform an assessment for children's services when she was not comfortable doing so, but there is no evidence that this assignment was related to the alleged harassment.

[23]For example, even if she were not comfortable with the reporting options available to her at Lincare, Dhillon could have filed an EEOC charge and remained in her employment.

25

on the defendant's state of mind, not the nature of the defendant's egregious conduct. *Kolstad*[], 527 U.S. [at 535]. The employer "must at least discriminate in the face of a perceived risk that its actions will violate" the [discrimination statute]. *Id.* at 536 . . . Moreover, the plaintiff must show that the "malfeasing agent served in a 'managerial capacity' and committed the wrong while 'acting in the scope of employment.'" *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 405 (5th Cir. 2000) (citing *Kolstad*, 527 U.S. at 541[]). However, under the good-faith exception, "an employer may not be vicariously liable for the discriminatory employment decision of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* (citing *Kolstad*, 527 U.S. at 545[]) (internal quotation marks omitted).

*E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 732 (5th Cir. 2007).

The Fifth Circuit has found "good faith" efforts to exist where the employer "had a well-publicized policy forbidding sexual harassment, gave training on sexual harassment to new employees, established a grievance procedure for sexual harassment complaints, and initiated an investigation of the plaintiffs' complaints." *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 477 (5th Cir. 2002).

In this case, as discussed above, Lincare, a national company, had an employee handbook containing an Anti-Harassment Policy, as well as other policies under which an employee could have presented her harassment complaints. Employees were also required to watch a video on harassment as part of their orientation. Although the Court cannot conclude as a matter of law that Dhillon was unreasonable in failing to take advantage of the reporting methods offered to her because of the unique circumstances of her case, the Court finds that she has not raised a genuine issue of material fact for trial on her claim for punitive damages. There is no question here that Lincare acted in good faith in trying to provide its employees with the knowledge and resources to report harassment. If the jury believes Dhillon's testimony and evidence, than Wright (as a managerial employee), Roan, and Felter acted contrary to the efforts of Lincare to

26

comply with Title VII.

Lincare's Motion for Summary Judgment on Dhillon's claim for punitive damages is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### C. State Law Claims

#### 1. Assault and Battery

Lincare also moves for summary judgment on Dhillon's state law claim of assault and battery. This a delictual action subject to a one-year prescriptive period. *See Hazey v. McCown* 2001-0929 (La. App. 1 Cir. 5/10/02),818 So.2d 932; *Woods v. St. Charles Par. Sch. Bd.*, No. 01-CA-162 (La. App. 5 Cir. 6/27/01), 790 So.2d 696.

Dhillon does not deny that her assault and battery claim is subject to a one-year prescriptive period, but argues that the actions of her co-workers were clearly connected to and part of the pattern of hostile work environment and her constructive discharge and, thus, should be viewed as continuing. However, Dhillon has cited the Court to no authority, and the Court has found none, in support of argument that the one-year prescriptive period is "continuing" for an assault and battery.[24] *See Bustamento v. Tucker*, No. 92-C-0523 (La. 1992), 607 So.2d 532, 540. Thus, the Court applies the one-year prescriptive period to determine if her claim is timely.

In her Complaint and in her deposition, Dhillon alleges Wright kicked her in the butt and told her to "get her ass to work" a week or two before the October 13, 2005 meeting. Although not listed in her Complaint, Dhillon also testified that some time during the summer of 2005 Jones stood on her shoes with his steel-toed boots and told her not to "tell on him" again. Both

---

[24]In fact, a battery is more akin to the type of discrete act of discrimination which is not deemed continuing in the Title VII context.

27

of these incidents occurred more than one year prior to the filing of her lawsuit on October 16, 2006. Under these undisputed facts, Dhillon's assault and battery claim has prescribed, and Lincare's Motion for Summary Judgment on this claim is GRANTED.

## 2.    Intentional Infliction of Emotional Distress

Lincare also moves for summary judgment on Dhillon's state law claim of intentional infliction of emotional distress.[25] Lincare argues that this claim is also prescribed, and, even if it is timely, Dhillon's claim fails as a matter of law.

Intentional infliction of emotional distress is also a delictual action subject to a one-year prescriptive period. *See Pratt v. Louisiana State Medical Center In Shreveport*, 41,971 (La. App. 2 Cir. Feb. 28, 2007), 953 So.2d 876, 880 (citing La. Civ. Code art. 3492) (other citations omitted). However, the Louisiana Supreme Court has ruled that "a pattern of on-going, repeated harassment which gradually caused [plaintiff] serious emotional injury" sufficient to constitute intentional infliction of emotional distress is actionable as a continuous tort, and that "prescription does not run until such continuous conduct is abated." *Bustamento,* 607 So.2d at 538-39. In this case, the harassment did not abate until Dhillon resigned her employment on October 17, 2005.

Applying this case law, the Court finds that Dhillon's claim of intentional infliction of emotional distress is timely. She resigned on October 17, 2005, and she filed suit on October 16,

---

[25]Dhillon asserts this tort claim against Lincare, not against the individual employees involved. An employer is "not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours." *Baumeister v. Plunkett*, 95-2270 (La. 5/21/96), 673 So.2d 994, 1000. "There must additionally be at least some evidence that the intentional act was reasonably incidental to the performance of the employee's duties or that the tortious act was primarily employment rooted." *Id.*

2006. Therefore, Dhillon's claim has not prescribed.

Lincare also alleges, however, that Dhillon has failed to meet the exacting standard for this type of claim.

The Louisiana Supreme Court first recognized this cause of action in *White v. Monsanto*, 585 So.2d 1205 (La. 1991). In that case, the Court explained:

> One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> Thus, in order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*Id.* at 1209-10 (internal citations omitted). Although this tort can occur in the workplace environment, recovery "has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Id.* at 1210. The mere fact that an employee was discriminated against, standing alone, does not constitute intentional infliction of emotional distress. *See, e.g., Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1144 (5th Cir. 1991) ("We agree . . . that more is required to prove intentional infliction of emotional distress than the usual ADEA claim.") (quoting *Dean v. Ford Motor Co.*, 885 F.2d 300 (5th Cir. 1989)).

Having fully reviewed the evidence in this case, the Court finds for the same reasons stated in its ruling on Dhillon's constructive discharge claim that she has not raised a genuine issue of material fact that she was subjected to outrageous behavior sufficient to hold Lincare accountable under vicarious liability for intentional infliction of emotional distress. Lincare's Motion for

Summary Judgment on this claim is also GRANTED.

## III.    CONCLUSION

For the foregoing reasons, Lincare's Motion to Strike [Doc. No. 46] is GRANTED IN PART and DENIED IN PART. The Court has STRICKEN and not considered certain conclusory statements contained in three affidavits submitted with Plaintiff's opposition memorandum. The Court has further STRICKEN and not considered Plaintiff's statement number 4 in its Revised Statement of Contested Material Facts.

Lincare's Motion for Summary Judgment [Doc. No. 35] is also GRANTED IN PART and DENIED IN PART. Lincare's Motion for Summary Judgment is GRANTED as to Dhillon's claims of constructive discharge, assault and battery, and intentional infliction of emotional distress, and these claims are DISMISSED WITH PREJUDICE. Lincare's Motion for Summary Judgment is otherwise DENIED.

MONROE, LOUISIANA, this _____18_____ day of _____June_____, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

30